**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

APR 2 7 2004

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

| | |
|---|---|
| Seth Culler, Dennis Haile, Rucha McCall, Bruce Tandy, Disability Action Center, and other similarly situated individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>South Carolina Electric & Gas Co., SCANA Corp., Laidlaw Transit Services Inc., Beverly Edwards, in her official capacity as Vice-President of Laidlaw Transit Services, Inc, City of Columbia, Robert D. Coble, in his official capacity as Mayor of Columbia, Central Midlands Council of Government, Norman Whitaker, in his official capacity as Executive Director of Central Midlands Council of Government, Central Midlands Regional Transit Authority, Lowell "Butch" Spires, in his official capacity as Chairman of the Board of Central Midlands Regional Transit Authority, Connex TCT, LLC, and Tom Hartley,<br><br>    Defendants. | C/A No. 3:02-2803-17<br><br>ENTERED<br>4-28-04<br><br><br>**ORDER ON<br>MOTIONS TO DISMISS** |

  This class action, filed on August 22, 2002, is before the court on motions to dismiss filed by South Carolina Electric & Gas Company ("SCE&G"), SCANA Corporation ("SCANA"), Laidlaw Transit Services, Inc. ("Laidlaw"), the City of Columbia ("the City"), Robert D. Coble ("Coble"), Central Midlands Council of Government ("CMCOG"), Norman Whitaker ("Whitaker"),[1] Lowell

---

[1] On June 2, 2003, Norman Whitaker succeeded Doug Phillips as Executive Director of the Central Midlands Council of Governments.

1

"Butch" Spires ("Spires"), Connex South, LLC[2] ("Connex"), and Tom Hartley ("Hartley"). In addition, SCE&G filed a motion to dismiss the crossclaim asserted against it by CMCOG.

The parties fully briefed the numerous issues involved and the court heard oral argument on April 8, 2004. The court's rulings on the various motions are detailed below.

## I. FACTUAL AND PROCEDURAL HISTORY

Prior to 2002, SCE&G (or one of its predecessor entities) operated a fixed-route public transportation system in Columbia, South Carolina, pursuant to a franchise agreement with either the State of South Carolina or the City of Columbia. For at least some of the years during which SCE&G operated the system, SCE&G hired Laidlaw to provide a complementary paratransit system, known as Dial-A-Ride Transit ("DART"). Laidlaw leased the vehicles with which it operated DART from CMCOG.

In April of 2002, the South Carolina General Assembly enacted a statute expressly authorizing the City of Columbia to negotiate SCE&G's release from the franchise agreement. On October 15, 2002, SCE&G was released from its franchise obligations, and it and Laidlaw ceased to operate the fixed-route and paratransit systems. Thereafter, the Central Midlands Regional Transit Authority ("CMRTA") took over as administrator of both systems. On November 1, 2002, Connex entered into an agreement with CMRTA and thereby assumed responsibility for the day-to-day operation of DART.

The plaintiffs' Amended Complaint contains four causes of action alleging violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12133; the Rehabilitation Act of 1973 ("Rehabilitation Act"); 29 U.S.C. § 794a; the South Carolina Unfair Trade Practices Act

---

[2] As of January 1, 2004, Connex TCT, LLC, became known as Connex South, LLC.

("SCUTPA"), S.C. Code Ann. §§ 35-9-10, *et seq.* (Law Co-op. 1985) (Cumm. Supp. 2002); and the South Carolina Bill of Rights for Handicapped Persons, S.C. Code Ann. §§ 43-33-510, *et seq.* (Law Co-op. 1985) (Cumm. Supp. 2002). All four causes of action arise from alleged deficiencies in the operation of the DART system between 1992 and 2003.

On September 30, 2003, the court issued an order certifying a class for injunctive relief and denying the plaintiffs' motion to certify a class for damages. On February 3, 2004, the plaintiffs filed an Amended Complaint, and, over the next two months, the defendants filed the various motions to dismiss addressed in this order.

## II. LEGAL STANDARD

A motion to dismiss should be granted only when it appears that plaintiff can prove no set of facts in support of a claim that would entitle plaintiff to relief on that claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the court must view the complaint in the light most favorable to plaintiff and resolve every doubt in plaintiff's favor. The plaintiff's allegations are to be taken as true for the purpose of ruling upon the motion. *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969). In addition, any inference reasonably drawn from the complaint must be considered together with plaintiff's allegations of fact. *Murray v. City of Milford*, 380 F.2d 468, 470 (2d Cir. 1967). However, the court may not consider conclusions of law or unwarranted deductions of fact. *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D.Md. 1991). It is also well-settled that a complaint cannot be amended by plaintiff's briefs in opposition to a motion to dismiss. *Id.* at 1068.

3

### III. DISCUSSION

*A.    The April 8, 2004 Rulings*

At the hearing on April 8, 2004, the court articulated several rulings. These rulings, and the rationale supporting them, are memorialized below.

    1.    The Individual Defendants

Defendants Coble, Spires, Whitaker, and Hartley (the "Individual Defendants") are all sued in their official capacities as Mayor of Columbia, Chairman of the Board of CMRTA, Executive Director of CMCOG, and General Manager of Connex, respectively. The entities with which the Individual Defendants are affiliated are co-defendants in this action. As the United States Supreme Court explained in *Kentucky v. Graham*, 473 U.S. 159 (1985), "[o]fficial capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 165 (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Were the plaintiffs in this case to obtain a judgment against one or more of the Individual Defendants, the plaintiffs would have to look to the entity with which the individual is affiliated, and not to the individual, for relief. Because they are sued in their official capacities and the organizations with which they are affiliated are also named in the suit, the Individual Defendants are redundant parties.

The plaintiffs have made it clear, both in their responsive memoranda and in their argument on April 8, 2004, that the Individual Defendants were named in this suit solely as a means to obtain prompt equitable relief in the event the court orders such relief. In the plaintiffs' words, "[t]he purpose for naming individual defendants is simply to provide a responsible individual person against whom an injunction may issue and, if necessary, be enforced." Plaintiffs' Response to Defendant Connex's Motion to Dismiss at 11. In addition, it became clear at the April 8, 2004 hearing, that the

plaintiffs were concerned that, were the court to grant injunctive relief without designating an individual to look to for implementing the relief, the relief might be slow in coming or never come at all. In response to these concerns, the court assures the plaintiffs that should it order equitable relief in this matter, it would do so in explicit language with appropriate compliance deadlines. Accordingly, the individual defendants are unnecessary parties, and their motions to dismiss are hereby granted.

    2.    The Injunctive Class

As explained above, on September 30, 2003, this court certified a class of plaintiffs seeking injunctive relief. However, because several of the defendants are no longer involved in running the fixed-route system or DART, there is no injunctive relief to be obtained from them. Because injunctive relief can only be obtained from the current operators, Connex and CMRTA,[3] the court finds that all other defendants should be dismissed with respect to the class-claim for injunctive relief. Accordingly, this court orders that these defendants be dismissed with respect to the class-claim for injunctive relief.[4]

    3.    The City of Columbia

---

[3] On October 15, 2002, CMRTA assumed responsibility for running the fixed-route system and DART. The following month, Connex entered into an agreement with CMRTA and assumed responsibility for running DART.

[4] One of the paragraphs of the Prayer for Relief in the Amended Complaint requests that the court: "Declare [the defendants] to be in violation of the ADA, Section 504, the South Carolina Bill of Rights for Handicapped Persons and the South Carolina Unfair Trade Practices Act." At the hearing on April 8, 2004, counsel for the plaintiffs argued that, although a number of defendants are no longer involved in running Columbia's public transportation system, those defendants should remain in the case based on the declaratory relief that the plaintiffs are seeking. This court finds that such a declaration would only be relevant to the claims for damages. Therefore, to the extent the class seeks declaratory relief against defendants other than CMRTA and Connex, those claims are dismissed.

In its Motion to Dismiss, the City of Columbia argues that it is not currently responsible, and has never been responsible, for operating the fixed-route system or DART and should therefore be dismissed from the case. The City cites *State ex rel. Daniel, Attorney General v. Broad River Power Co., et al.*, 153 S.E. 537 (S.C. 1929), in support of its argument that the State of South Carolina was the original grantor of the right to operate a fixed-route system. *See id.* at 547.

The plaintiffs claim that the City, although not the operator per se, has been so heavily involved in the administration of the public transportation system that it should remain in the case. Specifically, the plaintiffs point to the City's allowing SCE&G to operate the system, negotiating SCE&G's release from its franchise obligations, participating in the creation of the CMRTA, and disbursing of funds received from SCE&G after SCE&G was released. The City admits to negotiating SCE&G's release from its franchise obligations, but argues that it did so pursuant to a state statute explicitly granting the City the right to negotiate the release. *See* S.C. Code Ann. § 58-27-120 (Supp. 2003).

Although the actions cited by the plaintiffs indicate that the City was peripherally involved with public transportation, this court finds that these actions fall far short of indicating that the City operated, or was responsible for the operation of, the fixed-route system or DART. It appears that the City's primary role was in *allowing* SCE&G to operate a system. Although the plaintiffs argue that, pursuant to *Daniel*, the City's allowing SCE&G to operate the system created a contract between the City and SCE&G such that the City is deemed sufficiently responsible for the operation of the system that it should remain a party in this action, this court is not convinced that *Daniel* requires such a conclusion. The portion of the *Daniel* opinion cited by the plaintiffs discusses whether or not the Broad River Power Company (a predecessor of SCE&G) should be permitted to escape obligations

that it voluntarily assumed. *Daniel* does not address the City's responsibility in the matter and there is no indication that, in allowing the utility to operate a public transportation system, the City thereby became responsible for the operation of the system. In short, the City's connections with the public transportation system are few and not of the character that confers responsibility on the City for the operation of the system. Accordingly, the City's Motion to Dismiss is granted.

4. South Carolina Unfair Trade Practices Act

SCUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20 (2003). The plaintiffs claim that, in failing to provide transportation to people with disabilities that is comparable to that provided to people without disabilities, the defendants are engaged in an "unfair" trade practice. A trade practice is "unfair" when "it is offensive to public policy." *Young v. Century Lincoln-Mercury, Inc.*, 396 S.E.2d 105, 108 (S.C. Ct. App. 1989). The plaintiffs argue that the defendants' conduct is offensive to public policy because the stated policy of the State of South Carolina is "to enable persons with disabilities to achieve maximum personal independence . . . and to participate fully in all aspects of society." S.C. Code Ann. § 10-5-210, *et seq.*

Some of the defendants argue that SCUTPA is not applicable to the present situation because the operation of a public transportation system does not constitute "trade or commerce." This court disagrees. The phrase "trade or commerce" is defined by statute as "the advertising, offering for sale, sale or distribution of any services and any property . . . and . . . any other . . . thing of value . . . ." S.C. Code Ann. § 39-5-10 (2003). Although some of the defendants argue this definition does not encompass a public transportation system, because the plaintiffs had to pay a fee in order to use

7

DART, this court finds that the defendants were clearly selling transportation services and thus engaged in a "trade or commerce."

Some of the defendants also argue that in attempting to provide paratransit service, even if the service is inadequate, they are not violating South Carolina public policy. This court agrees. The plaintiffs' core allegation is that the DART system, as operated by the defendants, was terribly inadequate. In plain language, the plaintiffs allege that the defendants did a poor job. This court finds that this type of conduct is simply not the type of conduct SCUTPA is designed to reach. In *Clarkson v. Orkin Exterminating Co., Inc.*, 761 F.2d 189 (4th Cir. 1985), the Fourth Circuit addressed the question of whether a negligently conducted termite inspection constituted an unfair trade practice. The *Clarkson* court, although acknowledging that "Orkin's representative failed to discover termite infestation that was present and visible," found that this "shows no more than that Orkin's representative was negligent or incompetent" and "does not establish a violation of the South Carolina Unfair Trade Practices Act." *Id.* at 190-91. The court further noted that "[t]here is no support in South Carolina law for the proposition that a service person violates the unfair trade practice statute if he performs his job poorly . . . ." *Id.* at 191. Having determined that SCUTPA was not intended to make those that inadequately perform a service liable, the court finds that the plaintiffs' claims against the defendants alleging violations of SCUTPA should be dismissed.

     5.     SCANA's Motion to Dismiss

SCANA argues that its position as the parent company of SCE&G does not make it amenable to suit for SCE&G's alleged conduct. Also, SCANA argues that because the plaintiffs have failed to allege any reason to disregard SCANA's separate corporate existence, SCANA's motion to dismiss should be granted.

AO 72A
(Rev.8/82)

In response, the plaintiffs argue that the true relationship between SCANA and SCE&G is unclear at this time and that SCANA's motion to dismiss should be denied. In addition, the plaintiffs note that they received correspondence from SCANA's attorneys in which the attorneys did not maintain that SCANA and SCE&G were separate and characterized any obligations SCANA or SCE&G may have had as "*our* transit obligations." (Emphasis added.) Finally, the plaintiffs point out that SCANA and SCE&G have the same corporate address in South Carolina.

A review of the Amended Complaint reveals that the plaintiffs' only allegation regarding SCANA is that SCANA is the parent company of SCE&G. There is no allegation that SCANA has any connection to this case aside from its relationship with SCE&G. Because SCE&G does not dispute that it operated the public transportation system prior to 2002, and because there is no indication that, should the individual plaintiffs obtain a judgment for damages against SCE&G, that SCE&G would be financially unable to satisfy such judgment, this court finds that there is no reason to disregard the corporate separateness of SCE&G and SCANA. Accordingly, SCANA's motion to dismiss is granted.

B.   *Additional Rulings*

At the April 8, 2004 hearing, the court took under advisement SCE&G, Laidlaw, and Connex's motions to dismiss. In addition, the court took under advisement SCE&G's motion to dismiss CMCOG's cross-claim. The court's rulings on the motions taken under advisement at the hearing are set forth below.

1.   The Federal Claims

Much of the argument of April 8, 2004, and a majority of the briefing submitted by SCE&G, Laidlaw, and Connex (the "Corporate Defendants"), focused on the question of whether the federal

9

statutes at issue here, the ADA and the Rehabilitation Act, were applicable to private entities.[5] The Corporate Defendants argue that since Title II of the ADA (the portion of the ADA upon which the plaintiffs' ADA cause of action is based) is explicitly applicable only to "public entities," the plaintiffs have failed to state a claim against the Corporate Defendants under the ADA. Furthermore, the Corporate Defendants argue that since the Rehabilitation Act only applies to entities that receive federal subsidies, and they receive no such funds, the plaintiffs have failed to state a claim under the Rehabilitation Act.

The plaintiffs counter by arguing that pursuant to federal regulations interpreting the ADA, when a private entity contracts with a public entity to operate a public transportation system, as is the case here, the private entity "stands in the shoes" of the public entity in terms of its obligation to comply with Title II of the ADA. In addition, the plaintiffs argue that because the Corporate Defendants receive federal funds, albeit not directly from the federal government, they must comply with the Rehabilitation Act.

The court has thoroughly reviewed the statutes and federal regulations at issue here and, for the reasons detailed below, finds that SCE&G, Laidlaw, and Connex, while subject to the Rehabilitation Act, are not subject to Title II of the ADA.

    a.    The ADA

The ADA is divided into five parts: Title I, Employment; Title II, Public Services; Title III, Public Accommodations and Services Operated by Private Entities; Title IV, Telecommunications;

---

[5] The two public entities remaining in the case, CMRTA and CMCOG, did not challenge the plaintiffs' claim that the ADA and Rehabilitation Act applied to them.

and Title V, Miscellaneous. The plaintiffs here brought suit under Title II. Section 202 of Title II provides:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (2004). A "public entity" under this provision is defined as "any State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1) (2004). Based on this definition, it is clear, and the parties do not dispute, that the Corporate Defendants are not "public entities" in the eyes of the ADA.

The plaintiffs maintain, however, that the Corporate Defendants' status as private entities does not permanently insulate them from the requirements of Title II. The plaintiffs argue that, by virtue of the Corporate Defendants' relationships with CMCOG, the City, and CMRTA,[6] the Corporate Defendants are required to comply with Title II of the ADA and are amenable to suit for failing to comply. For the reasons stated below, this court finds that the plaintiffs are correct in arguing that the Corporate Defendants are required to comply with Title II, but are incorrect in claiming that the Corporate Defendants are amenable to suit for failing to do so.

The plaintiffs rely primarily on 49 C.F.R. § 37.23 (2004), often called the "stand in the shoes" provision, in support of their argument that the Corporate Defendants are amenable to suit under Title II. Section 37.23 provides:

---

[6] As a matter of review, before October 15, 2002, CMCOG (a public entity) contracted with SCE&G (a private entity) to provide fixed-route service, who in turn contracted with Laidlaw (a private entity) to provide paratransit. After October 15, 2002, CMRTA (a public entity) provided fixed-route service and contracted with Connex (a private entity) to provide paratransit.

11

> When a public entity enters into a contractual or other arrangement or relationship with a private entity to operate fixed route or demand responsive service, the public entity shall ensure that the private entity meets the requirements of this part that would apply to the public entity if the public entity itself provided the service.

By the plain language of this regulation, a private entity that contracts with a public entity must comply with the provisions of the ADA applicable to the public entity. Therefore, the plaintiffs argue, Title II is applicable to the Corporate Defendants. The plaintiffs also cite the Department of Transportation's "Final Rule," which specifically discusses the situation in Columbia, South Carolina. The Final Rule states, in part, that "[t]he Department concludes, then, that in this South Carolina situation the [private entity] is subject to the requirements that would apply to a public entity providing the same kind of service . . . ." 56 Fed. Reg. 45588 (Sept. 6, 1991).

The plaintiffs argue that, based on the "stand in the shoes" provision, the Corporate Defendants must comply with Title II and are amenable to suit for failing to do so. This court, however, finds that in making this argument, the plaintiffs are asking the court to stretch the "stand in the shoes" provision beyond its breaking point. As this court interprets the "stand in the shoes" provision, although it requires the private entity to comply with Title II, the *public entity* remains legally responsible for the private entity's compliance. The regulation clearly states that "the *public entity* shall ensure that the private entity meets the requirements . . . ." This interpretation preserves the separateness of Title II and Title III but prevents a public entity from dodging its obligations under Title II by contracting with a private entity.

This court's reading of the "stand in the shoes" provision is supported by 49 C.F.R. Part 37, Appendix D, interpreting § 37.23. The regulation reads: "[Section 37.23] requires private entities to 'stand in the shoes' of public entities with whom they contract to provide transportation services. *It*

12

*ensures that, while a public entity may contract out its service, it may not contract away its ADA responsibilities.*" (Emphasis added.) Furthermore, the DOT "Final Rule" cited by the plaintiffs supports this interpretation. The "Final Rule" states (in a passage just two paragraphs before the passage cited by the plaintiffs):

> Under [Section 37.23], when a public entity (like [a metropolitan planning organization] or a city) enters into a contract or other arrangement or relationship with a private entity to operate fixed route or demand responsive service, *the public entity must ensure that the private entity meets the requirements that would apply to the public entity if the public entity itself operated the service.*

56 Fed. Reg. 45588 (Sept. 6, 1991).

In sum, the regulations make clear that while Title II is not directly applicable to private entities, the requirements of Title II may be imposed *by a public entity* on the private entity if the two entities enter into certain relationships. This observation is supported by the Department of Justice's Technical Assistance Manual, which states in reference to Title II's applicability to private entities:

> Public entities are not subject to title III of the ADA, which covers only private entities. Conversely, private entities are not subject to title II. In many situations, however, public entities have a close relationship to private entities that are covered by title III, with the result that certain activities may be at least indirectly affected by both titles.

Civil Rights Division, U.S. Dep't of Justice, The Americans with Disabilities Act Title II Technical Assistance Manual II-1.3000 (1993).

In the instant case, the Corporate Defendants, as private entities, are not subject to suit under Title II of the ADA. To the extent the Corporate Defendants contracted with a public entity that was subject to Title II, the Corporate Defendants' compliance with Title II remained the legal responsibility of the public entity. Because the Corporate Defendants are not public entities, they are

13

not subject to suit under Title II, and the plaintiffs' cause of action against the Corporate Defendants pursuant to the Title II must be dismissed.

      b.      The Rehabilitation Act

Section 504 of the Rehabilitation Act provides, in part: "No otherwise qualified individual with a disability in the Untied States, . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a) (2004). The Corporate Defendants argue that they are not subject to the Rehabilitation Act for two reasons. First, the Corporate Defendants argue that plaintiffs' Rehabilitation Act claim must be dismissed because operating a public transportation system is not a "program or activity" as that term is defined in the statute. Second, the Corporate Defendants argue that they are not required to comply with the Rehabilitation Act because they do not receive federal financial assistance.

In regard to the first argument, the Act defines "program or activity" as: "[A]ll of the operations of an entire corporation . . . if assistance is extended to such corporation . . . as a whole; or the entire plant or other comparable geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation." 29 U.S.C. § 794(b)(3) (2004). Because the court must determine whether, and to what extent, the Corporate Defendants receive federal financial assistance to determine if they are a "program or activity" under the statute, this argument collapses into the Corporate Defendants' second argument.

As for the second argument, the Corporate Defendants do not deny that they receive federal funds as alleged in the Amended Complaint.[7] They argue that, although they *indirectly* receive federal funds, they are not recipients of "financial assistance" such that they are required to comply with the Rehabilitation Act. Specifically, the Corporate Defendants characterize their receipt of funds as more like payment for services under a procurement contract and less like a federal subsidy. The Corporate Defendants cite several cases discussing the difference between funds received for services rendered pursuant to a procurement contract, which would not trigger compliance with the Rehabilitation Act, and funds that are subsidies designed to assist the recipient. *See, e.g., Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 278 (6th Cir. 1996) ("[T]he coverage of the Rehabilitation Act does not follow federal aid 'past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a procurement contract.'") (quoting *Hamilton v. Illinois Cent. R.R. Co.*, 894 F. Supp. 1014, 1022 (S.D. Miss. 1995)); *Jarno v. Lewis*, 256 F. Supp. 2d 499, 504 (E.D. Va. 2003) ("Although the Fourth Circuit has yet to address this issue, other circuit courts have squarely held that procurement contracts do not constitute federal financial assistance where the recipient receives no government subsidy for its services but rather acts solely as a market participant.").

In the instant case, the plaintiffs have clearly alleged that all three of the Corporate Defendants received federal funds through CMCOG. Although the exact path these funds take in traveling from

---

[7] Paragraph 39 of the Amended Complaint reads:

"Upon information and belief, CMCOG receives the federal funds from the Federal Transit Administration (FTA) on behalf of [Defendants]. CMCOG disbursed these funds, at least in part, to SCE&G and Laidlaw for expenses related to the operation of DART. Upon information and belief, CMCOG now disburses those funds to Defendants CMRTA and Connex."

15

the Federal Transit Administration to the Corporate Defendants is unclear at this time, taking the allegations of the Amended Complaint as true, there is an insufficient basis for this court to proclaim that these funds do not constitute "federal financial assistance." This being the case, the court denies the Corporate Defendants motions to dismiss the plaintiffs' cause of action under the Rehabilitation Act.

2. South Carolina Bill of Rights for Handicapped Persons

The South Carolina Bill of Rights for Handicapped Persons provides that "[n]o person may discriminate against a handicapped person with respect to public accommodation, public services or housing without reasonable justification." S.C. Code Ann. § 43-33-530 (2003). The plaintiffs allege that the defendants violated this statute by failing to provide basic and necessary public transportation to handicapped persons. The defendants argue that the allegations in the Amended Complaint do not support a claim under this statute. Unfortunately, this court could find only two cases that even mention this particular statute, and neither of the cases is relevant to this action. *See Cooper v. Lab. Corp. of Am. Holdings*, 181 F.R.D. 312 (D.S.C. 1997) (mentioning that the plaintiff's complaint contained a cause of action under the South Carolina Bill of Rights for Handicapped Persons, upon which the parties reached a settlement); *Love v. TPI Rests. Inc.*, C/A No. 0:91-2184-17, 1992 U.S. Dist. LEXIS 20699 (D.S.C. Apr. 8, 1992) (discussing the South Carolina Bill of Rights for Handicapped Persons in the employment context).

In short, based on the allegations of the Amended Complaint, this court has an insufficient basis to hold that the plaintiffs have failed to state a claim. Accordingly, the motions to dismiss as to the cause of action under the South Carolina Bill of Rights for Handicapped Persons is denied.

3. SCE&G's Motion to Dismiss CMCOG's Cross-Claim

On February 17, 2004, CMCOG answered the Amended Complaint and filed a cross-claim against SCE&G. In the cross-claim, CMCOG alleges that under agreements between it and SCE&G dated 1992, 1994, and 1999, SCE&G contracted to comply with the provisions of the ADA and to indemnify CMCOG for any violation of the agreements. In the 1992 agreement, SCE&G agreed:

> To comply with the applicable requirements of the Americans with Disabilities Act provisions for transportation services for individuals with disabilities as implemented by 49 CFR Parts 27, 37, and 38, as amended, relative to private entities not primarily engaged in the business of transportation who contract with public entities for the provision of public fixed route transportation services.
>
> * * *
>
> To protect, indemnify, defend and save [CMCOG] harmless from and against all liabilities, losses, damages, costs, expenses (including without limitation, reasonable attorneys' fees and expenses), causes of action, suits, claims, demands, or judgments of any nature whatsoever arising out of any violation of this Agreement by SCE&G or any negligence or misconduct of SCE&G or any person for whose conduct SCE&G is legally responsible.

Pursuant to an addendum to the 1992 agreement, which modified the first paragraph above and was signed in 1994, SCE&G agreed:

> To comply with <u>all</u> applicable requirements of the Americans with Disabilities Act provisions for <u>fixed route and paratransit services as defined by</u> 49 CFR Parts 27, 37, and 38 <u>— Transportation for Individuals with Disabilities; Final Rule, dated Friday, September 6, 1991</u>.

Finally, in 1999, SCE&G and CMCOG entered into a new agreement that contained the ADA compliance provision of the 1994 addendum (without the emphasis) and the hold harmless provision of the 1992 agreement.

CMCOG maintains that, to the extent that any ADA violations existed during the period SCE&G was responsible for operating the fixed-route and paratransit system, SCE&G breached the contract between the parties and must indemnify CMCOG. SCE&G argued in its motion to dismiss

17

that the language of the agreements only requires it to comply with Title III of the ADA, the title applicable only to *private* entities. This court disagrees. All of the agreements clearly reference 49 C.F.R. § 37, the regulation that contains the "stand in the shoes" provision discussed earlier in this order. As explained in the portion of this order addressing the plaintiffs' ADA claim, a private entity that contracts with a public entity must comply with the provisions of the ADA that apply to public entities. While the public entity remains legally responsible for having the private entity comply, there is nothing in the regulations that forbids the public entity from entering into a contract with the private entity that shifts the burden of compliance to the private entity. Because CMCOG has stated a claim against SCE&G for breach of the agreement to comply with the ADA and indemnify CMCOG, SCE&G's motion to dismiss the cross-claim is denied.

## IV. CONCLUSION

At the April 8, 2004 hearing, the court granted the motions to dismiss all claims filed by the City of Columbia, the individual defendants, and SCANA. At the same hearing, the court dismissed the SCUTPA claim against all defendants. In addition to the rulings made at the hearing, the court now grants the Corporate Defendants' motions to dismiss the ADA claim, denies the Corporate Defendants' motions to dismiss the claim under the Rehabilitation Act, denies the Corporate Defendants' motions to dismiss the claim under the South Carolina Bill of Rights for Handicapped Persons, and denies SCE&G's motion to dismiss CMCOG's cross-claim.

The remaining claims and parties are as follows: claims under the Rehabilitation Act and South Carolina Bill of Rights for Handicapped Persons against SCE&G, Laidlaw, Connex, CMRTA, and CMCOG; and claims under the ADA against CMRTA and CMCOG. Finally, CMCOG has a

pending cross-claim against SCE&G. Of these claims, only the claims against CMRTA and Connex are class claims for injunctive relief.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.
United States District Judge

Columbia, South Carolina
April 26, 2004